Council you may proceed. May it please the court, my name is Erin Ronstadt and with my co-counsel Kevin Kelbel we represent the appellant Diel Talbot. I will watch my time but I would like to reserve three minutes for rebuttal. Ms. Talbot has fought for years to exercise her rights under ERISA, rights that should be unequivocal, the right to plan documents, the right to the identity and the protections of a plan administrator, the right for a fair review of her claim, and the right to equitable remedies and penalties that should be available against fiduciaries. And it is undisputed in this case that the appellees are fiduciaries under ERISA. But instead of acting as Talbot, of trying to prove up who the plan administrator is. And the District Court erred in allowing that to happen. Without questions from the court about our claim for benefits, I'm going to let that stand as submitted on the briefs and focus today on two main issues. One, the issue that as long as there are plan participants, especially plan participants receiving benefits, then there must be a plan administrator under ERISA. And to find anything short of that contravenes the very purpose of ERISA under 1001B. Second, Ms. Talbot properly pled disgorgement. And she's not remedied in other parts of ERISA for disgorgement. You know, those two questions are really off to one side of what I think would, for me, would be the central question. And that is to say, was she wrongly denied benefits? I just have to say, what's the evidence upon which the denial of benefits was based? And was that sufficient evidence that she should have been done? That, to me, is the core of the case. All right, Your Honor. I absolutely agree with you on that. And I prefer to hear argument on that, rather than those points that I think are in the case, but somewhat off to one side. All right, Your Honor. Thank you for that. So focusing on Ms. Talbot's claim for benefits, the district court erred in finding that Reliance was not acting under a conflict of interest. Well, specifically that that conflict... I thought the parties agreed that Reliance had a conflict of interest. I thought that was undisputed. Yes. And so, I erred in finding that that conflict of interest did not so taint Reliance's decision as to completely strip it of discretion in this case. And there are several... What the district court failed to do is it failed to look at all of the different pieces of evidence of conflict and weigh those things collectively to strip Reliance of discretion. And Appellate would like to add that the fact that there was not a plan administrator, there were not premiums being received, should have been one of the threshold issues looked at in deciding whether or not the conflict tainted the decision. The district court did not do that. Who owed the premiums, though? Who owed the premiums to Reliance? Was it the employees? The employer did. And so, when Paymentech terminated the plan in 2008, Reliance no longer received premiums for that policy. So, it was effectively a runaway policy. You have plan participants receiving benefits, but the very thing that that helps insurance companies make money, which is premiums, were no longer being received. Insurance companies, at the end of the day, make money by premiums that they bring in and claims that they pay out. So, now we don't have... No, they make money by premiums that come in and claims they don't pay. Oh, excuse me, Your Honor. That is accurate. So, without a plan administrator and without premiums coming in, you know, once again, it really was this runaway policy. And so, given that fact, the conflict should have immediately been viewed with increased skepticism. Given... There's a few huge points on this that I will touch on. Okay, let's talk about the Social Security Award that was contrary to the findings. Yes. Your Honor, but... Did the plan... Did Reliance consider that in compliance? Reliance did not even request a Social Security file, and it did not have the administrative law judge's fully favorable determination. Reliance had the notice of award for Social Security. I would submit that's all that they cared about. Once they had that, they immediately... Yeah, that was worth $47,000 to them. They cared a lot about that. Correct. And that money allowed them to actually have their liability on the claim, meaning they had paid to date about $82,000, and once you took that out, it ended up being around $30,000, $32,000. So, they never had the Social Security determination. They eventually got it, though? No, Your Honor. They never knew the determination? They have never gotten the Social Security judge's fully favorable determination. They never requested the file. They never asked Ms. Talbot to provide that information as part of the appeals process. And did Ms. Talbot try to submit it to them? Ms. Talbot did not try and submit it because Ms. Talbot didn't know that that was something that Reliance needed. Was she counseled at the time? No. She was representing herself through the entire appeals process. And the Social Security determination would have been extremely important for Reliance to have because their big issue with Ms. Talbot is credibility. They questioned her credibility. Well, here we have an administrative law judge who looked at her. She went to a hearing, heard this 31-year-old at the time talk about how her pain is debilitating, and decide, based off of her physical impairments, under Social Security's more stringent standard, that she was completely disabled. Well, it's a more stringent standard under Social Security. On the other hand, on Social Security, as I'm sure you know, there's the treating physician rule. And the treating physician here very much supported her claim. But with respect to ERISA, there's no treating physician rule. Yes, Your Honor. And perhaps that would be more compelling in this case had Reliance had their IME doctor, Dr. Rouse, reach out to Dr. Suber, the treating physician, and seek clarification. But Reliance never did that. So, without the Social Security file, how could we know that the treating physician rule and Dr. Suber's statements— No, wait a minute. How could you know the treating—of course you know the treating physician rule. That's just the rule. Oh, excuse me. Know how much the treating physician rule, meaning how much Dr. Suber's statements played into the administrative law judge's determination. I'll give you a little softball here. Also, in Social Security, there's no fiduciary duty owed, unlike in ERISA. Correct, Your Honor. I mean, so that would impact how you would view her claim, right? Or should? It should. Reliance will contend that the fact that they provided benefits during this 246-day-long appeal period is in fact evidence of them acting as a fiduciary. They will say that the fact that they let her respond to the IME is also evidence of them acting fairly. The fact of the matter is, they actually used their position of power, instead of acting as a fiduciary, had her sign a tolling agreement after the 90 days had already expired—so 45 days, plus 45 days for special circumstances—had her sign a tolling agreement so that they can take as much time as they wanted. And that time was not used to get the Social Security determination or talk to Dr. Suber. It was used to secure the second IME in four months that ended up being this 30-plus page report basically calling Ms. Talbot a malingerer. Now, there are three IMEs. There's Sherman, there's Howard, and there's—I'm not sure how to pronounce it—Rouse. And they all come to the same conclusion. Rouse is much harsher, but the first two basically come to the same conclusion. Yes, Your Honor, except then that begs the question why those IMEs supported—well, at least the first one, Dr. Sherman's—why did that support the payment of benefits in this case? Well, because she was appealing and they decided to pay during the pendency of the appeal. Maybe I'm mistaken, but isn't that right? Well, going back—so let me break this down. The first IME was done back in the early 2000s. Back in 2010, along with a functional capacity evaluation. After that evidence, Reliance approved the claim. It was only after the Social Security determination and when they recovered the overpayment that they decided to start to evaluate the claim again. They actually surveilled her. The surveillance supported her. They got nothing. She never left the house, right. Correct. So the fact that we have three IMEs collectively coming to the same conclusion that are all bought and paid for by Reliance, it's like there's two stories going on here. There's a story that they're creating that they're paying for, and then there's the reality of the record. And the real piece of evidence that they should have cared about if they Why did the administrative law judge find the way that he did? Now, would the appropriate—if we were to agree with you, would the appropriate resolution be for us to send it back to say, have a look at the Social Security file? I think that under Pannebecker, the appropriate resolution would be to award benefits and then send it back for a remand. But I think that— Award benefits on a contingent basis? What do you mean when you say award benefits? Because under Pannebecker, until the plan terms, policy or plan terms, are properly applied, if—then benefits should continue until the insurance company appropriately applies— I see. Yeah, yeah. So award benefits until we get another determination. If the determination is favorable, then she wins. If the determination is unfavorable, she's gotten benefits up to that point, and then she can appeal again. That's the idea. Yes, Your Honor. I will reserve the rest of my time for rebuttal. Thank you. All right. Thank you, counsel. Good morning, Your Honors. I'm Anne-Martha Andrews on behalf of Reliant Standard Life Focusing on the benefit claim, I would first like to point out that there has, throughout both the briefing in the district court and the briefing on appeal, been a striking lack of focus on the 502A1B claim by the plaintiff, and I think there's a reason for that. The focus really has been solely on the alleged dual role conflict. And, of course, dual role conflict can be a factor in these cases, and evidence of the conflict may temper the abuse of discretion standard. But as the Supreme Court said in the Glenn v. MetLife case, it's one factor to be used as a tiebreaker in a closed case. But the question ultimately for this court is whether the plaintiff has established that Reliant Standard abused its discretion, whether its decision that Ms. Talbot was not disabled under the terms of this plan was illogical, implausible, or without support in the record. And I submit to you that it's just simply not a closed case. The file as a whole shows that Reliant Standard, from the beginning, had doubts about Ms. Talbot's claim. Based on the facts of how the alleged injury occurred, it denied the claim in 2008 when she appealed and said, well, I'm still under treatment. I still want to get more treatment. Because, remember, she fell down the stairs when she was pregnant. She had limited treatment options. And after she delivered her child, they took a look at the file and said, okay, well, she should be ready to—I think they let her go through her pregnancy and recovery. And then they terminated the claim. When she said, no, I'm actually still having problems, they overturned that. They went through the own occupation period, took a look at it again, again with an IME at that point, had an independent medical examination. This is in 2010, I believe. That was at the ENIAC test change. Had an IME with Dr. Sherman. And he recommended a functional capacity examination because there were already irregularities showing up with Ms. Talbot and her presentation and what exactly is going on with this claimant who doesn't have much really showing up in the examinations by her doctors, in the medical testing that they were able to determine. But she's got a presentation that's completely sort of out of sync with what the doctors were able to tell. So they did the FCE. The FCE had the same sort of analysis of that. So at that point, they terminated the claim again. On appeal, they overturned it again. And again, I would submit to you, this is what the court wants insurance companies to do. They want the insurance companies to go out and get IMEs, to get real information. That FCE was inconclusive primarily because Ms. Talbot was not cooperative for whatever reason. But instead of standing on that, Reliance Standard continued to pay. They continued to pay for another couple of years. Then again, as claims do, as claims should do, they continued to analyze the case and then they had the Howard, which was in 2012. And Dr. Howard again sees the same thing. Now you're seeing a progressive where they're seeing the same thing and the same thing and the same thing. Now you could submit that everybody has a point where the facts might tip for any particular person like, well, what are we seeing here? What is the problem? Is this person really disabled or not? And you and I or Reliance Standard and I or the plaintiff and I might disagree on when those facts might tip for any one person. But at that point, they terminated the claim again. The appeal came again. And that's when Dr. Rouse did a third IME, fourth exam. And I think one of your honors said Dr. Rouse was harsher. I would submit that she wasn't harsher. She was simply more detailed in her assessment. Well, whether harsher or not, I use the word harsh, she was harsh. You read Dr. Rouse's report. She really did not like this claimant. I mean, she starts out a report by recounting how she and her mother got in the car as a way of telling us that she was faking it. I mean, this is not the ordinary doctor report that I'm accustomed to reading. Well, your honor, here's what I would suggest to you. We have two things. We have a situation where the facts leading up to that, the medical records and the other IMEs leading up to that are suggesting, and again, I can't put myself in Dr. Rouse's shoes, but I will tell you from my shoes, where the facts are suggesting that the presentation, the exaggerated presentation, the dramatic presentation has been noted over and over again. I'm not sure what's happening here. That Dr. Rouse's report isn't harsh so much, again, as it is very detailed. And she's trying to suss out, if you read that report in detail, as I have a few times in Yes, I'm sure you have. She's trying to suss out precisely what's going on. She's trying to suss out, is there a psychological component? Is there a malingering component? What is the issue here? And in trying to determine the presentation overall, including the presentation coming in and going out, is part of trying to address that. And I believe probably in an occupational medicine physician, that's something that she's used to doing. But if you find it harsh, I'm sorry, Your Honor, but again, going back to the point, the question is whether or not Reliant Standard had a reasonable basis for its decision. And in this case, we have again this ongoing problem. What do we do, and because the other side has made something of this, what do we do with the, as it were, psychological or psychiatric diagnosis provided by Dr. Rouse about, well, she basically is trying to manipulate those around her. She's got a personality disorder. She doesn't really want to take on her responsibilities as a mother and so on. I mean, that doesn't strike me as within the area of expertise of Dr. Rouse. Whether or not it's, here's what I would say to that. Dr. Rouse as an occupational medicine physician has a relatively broad area of expertise, because occupational medicine is a pretty rigorous evaluation. The comments were made in the context of trying to determine and suss out precisely what was going on with this claimant. Whether or not she made that diagnosis doesn't change the fact of her ultimate conclusion, which was that this claimant was not disabled based on the claim that she was making. Is that what you're asking? So it is a commentary. She's trying to determine how much of it may be exaggerated. In fact, I think what she says is it's hard to determine whether some of it, how much of it may be exaggerated, how much of it may be psychologically based. And I think the comments were made in that context, and I think fairly made in that context, when you're looking at a claimant who presents the way this claimant did. What are we supposed to do with the fact that your client really never got the Social Security file? Well, with respect to the Social Security file, I'd say this. And I do want to back up and say one thing. The appellant has suggested here today, and has suggested with some of the supplemental citations, that somehow there should be a de novo review in this case. But the plaintiff below in here, there was never a suggestion that anything that occurred in this case should have required a de novo review. All of the arguments below, and even, I think, on the appeal, essentially were such that there were errors that should have affected the abuse of discretion review. So I did want to make that point outright. With respect to the Social Security award, this Court has said that that failure can be something that can be considered in the abuse of discretion review. Fine. In this particular case, the Social Security award was about two years before the final decision. There has been no suggestion whatsoever that we did not have the plaintiff's, excuse me, Ms. Talbot's, full medical record. And I think that's quite significant. So we had all of her full and updated medical records through the date of our decision. We also had three IMEs and an FCE. So to the extent that we didn't have that ALJ decision, to the extent that that may have affected reliance standards review in some way, what we did have is we had three doctors and a functional capacity examiner who had also looked at this woman in detail, and we had all of her medical records. So, you know, there's mitigation there to that extent. So to the extent the Court wants to weigh that as a factor, you know, it shouldn't really be given a lot of weight, which is what Judge Matoa said in her opinion, because we had two years after the Social Security decision maker had seen her to do our own. In fact, two of our IMEs took place after the Social Security award. Right. Is it customary, and this may not be in the record and you may not know, is it customary when there has been an award of Social Security benefits not to get the Social Security file? Is it customary at all, or? Well, you know, I mean, what happens in an ordinary case? Putting this case to one side, let's say you've got a claim for a long-term disability, and the claimant has received benefits from the Social Security Administration. Is it customary not to get the Social Security file? Well, I think that—I can't answer that, Your Honor. I can't answer that for this company or any company as a matter of custom. I can tell you that it depends, and I can tell you that in this particular case, the plaintiff, for instance, Ms. Talbot, sent us several pieces of the Social Security. She sent us the medical source statements from her doctor, for instance. So she was sending us quite a lot of information and sent us very detailed appeal letters, you know, 50-, 60-, 70-page appeal letters that would provide quite a lot of information. She was very well-versed in ERISA, citing ERISA regulations. She was very well aware of her rights under ERISA. I can't tell you whether that is customary for this company or any company. I suspect you would have—you would have liked to see the Social Security decision if the decision had been unfavorable. I don't think it's—I don't think it's true either way in terms of whether or not the—in terms of whether I can answer whether it's customary one way or the other. I don't think it's customary one way or the other to get the decision one way or the other. What I can tell you is that analysis by the Social Security Administration is not binding, per decisions of this Court and for good reason, I think the Supreme Court, is not binding on our company. And it certainly shouldn't be binding where we have information that the Social Security Administration didn't have. But Reliance was happy enough to take her Social Security benefits under the policy. Well, we didn't take her Social Security benefits. The—and actually, Your Honor, I have to say that that is a—that's a separate issue. This plan— Well, I know you would like that to be a separate issue, but you were willing to take the award of benefits and have it pursuant to your contract or the plan terms or whatever and benefit from her award while not taking the underlying contents to find out on what it was based. Well, respectfully, the plan is set up to offset Social Security benefits and other types of benefits, coordination of benefits, for good reason. That applies not just— I'm not asking whether there's a good reason. I'm observing a fact. Well, you're observing the fact, but what you're doing is tying the application of the one aspect of the plan, which is the coordination of benefits, to the idea that if we do that, then somehow, you know, we should be reliant on the Social Security Administration's decision for our own decision. Not reliant, but at least interested. Well, as I said, I can't say more than I've said before, Your Honor, which is to say that the company knew that she had been awarded the benefits, and they took that into consideration. But that award of Social Security benefits had also been two years before, and we did our job. And in fact, I would—I would say that pursuant to the—what courts like to do, independent medical examinations over record reviews. We did three of those in this case. And I think this Court actually likes to see more generous decision-making over less generous decision-making. All right. Counsel, you're over your time, and I don't think you need to tell us what we like to see. So just to let you know, I think we know what we like to see. Thank you. Thank you, Counsel. I think you had a minute—oh, you had five minutes. Okay. I'm sorry. Perhaps you'll explain who's representing who for us here. Your Honor, Eric Matheson on behalf of Defendant Payment Tech Resource, Inc. Oh, okay. The employer. Yes, correct. The— Former employer. Former employer. Right. Yes. Okay. May it please the Court, in my portion of—my client's portion of involvement in this case is fairly narrow, and it relates to the issue before this Court. The only question is whether it should be responsible for—whether the district court was correct in deciding that it was not responsible or could not be liable for the penalty claim. So what happens when, say, the employer goes defunct and was serving as the plan administrator? How can there be a situation where there's no plan administrator? Good question, Your Honor. And I think I—that was one of the issues that Ms. Talbot's counsel said she was going to talk about was, you know, that her point was that there has to be a plan administrator. And I think that's not correct if you look at the statute. And under the facts of this particular case, that's not true. There has to be a plan administrator when there is an active plan. And at all times, the record reflects it at all times in which the payment tech plan was in operation from 1996 until 2008, there was, in fact, a plan administrator, and it was my client. There's no dispute about that. It doesn't attempt to shirk its responsibility. However, it's also undisputed that in 2008, it formally terminated the plan. In 2009, in May, it filed its formal 5500 with the IRS, indicating that was the final filing. The joint venture that Payment Tech was part of ceased also in 2008, and Payment Tech itself ceased to exist at the end of 2010. So while there would have been, and there was, a plan administrator at previous times, at the time period in 2013, so five years after the plan formally terminated, appropriately terminated, and under the terms of the plan, in fact, it says right in the plan that Payment Tech had the ability to terminate at any point in its sole discretion. So in 2013, five years after it did that, it was no longer the plan administrator. Nothing in ERISA, either the statutes or the regulations from the Department of Labor, suggests that they have to assign a replacement plan administrator. And in fact, it wouldn't make sense here because there wasn't anything to administer any longer. The plan was terminated and defunct. There was the reliable ‑‑ there was, I don't know if anyone other than Ms. Talbot was still on claim, but to the extent there were any folks who are ‑‑ were on claim and receiving benefits under an insured policy like the Reliance Standard Policy, those folks were protected in that they continued to receive their benefits and payments to the extent that they were found to be payable under the terms of the insurance policy, just like they would have if, in fact, the plan had still been in effect. The ‑‑ but as far as needing a ‑‑ But your response is there wasn't a plan administrator, but there wasn't one ‑‑ it wasn't ‑‑ the law didn't require there to be one. That's correct, Your Honor. And I don't think there's a single case cited below or to this court, and none that I have found that suggests under the circumstances of a defunct plan and especially when the plan administrator is also defunct, that there has to be a plan administrator or that there's an imposition. How would a person who was still on claim get the plan documents in this situation? You know, I provide two responses to that, Your Honor. I think the first question is whether and for how long they're entitled to request the plan documents, and I think the district court addressed that and said there's a point at which that cuts off. But secondly, I think at some point when it does cut off, that they are not entitled to get the plan documents any longer. Here, the operative document or information that Ms. Talbot needed was the insurance policy. And there are separate claim regulations under ERISA that provide for what are called relevant documents, and the insurance policy would be a relevant document. She was entitled to get that from Reliance Standard, and in fact, she got that. As you heard from the chronology, and not that we were involved in it, but she went through three different appeals. So this was somebody that had the information needed to argue her case successfully twice and then on the, you know, did a third appeal that ultimately wasn't successful. So we believe, as far as it relates to payment tech and quite frankly to Reliance Standard as well, that there does not, in fact, have to be a plan administrator at this point in time. And I think this court decided that issue or touched on it in the Klein case and said a scattershot approach where you just say somebody has to be the plan administrator doesn't suffice. You have to set forth specific facts proving that. All right. Does anyone have a question? Okay. Thank you very much, counsel. Okay. Now, Ms. Ronstadt, you have your remaining time. In July of 2015, after we had filed the lawsuit, we saw the plan for the first time. In Section 5 of the plan, there's an appeal that can be made to the plan administrator. The plan administrator reserves discretion, absent the claims review fiduciary, to review any decision of that claims review fiduciary and decide whether benefits should be paid. Ms. Talbot was harmed by not having that plan. She fought with this company for years. And had she been able to look at that document and say, I'm going to call up payment tech, my employer. I'm going to see if they will take a look at this. That was a right that was contemplated within the plan. And she should have been able to do that. Was there anybody that she could have called? I mean, is the company still there? No, Your Honor. So who's she going to call? Therein lies the problem. But you're saying that she should have had the plan, so she could have made the call, but then you're telling me, unless I'm missing something, there's nobody to call. Well, back in 2008, payment tech was still a company until 2010. So at least through the first appeal, she could have called payment tech. I see. Okay. But this is why payment tech, as a fiduciary, should have thought this through. Payment tech respectfully didn't know, are there plan participants, people still receiving benefits, people who we need to think about as a fiduciary to protect their rights under ERISA. And that was not done, and that should have been done, and it would have avoided all of this, potentially. It might have. Question as to Social Security. What would have been in the file had the insurance company obtained the Social Security file that would have made a difference? I have not seen the Social Security file in a very long time. But I can tell you that it would have had an administrative law judge weighing the evidence. And, Your Honor, let me back up. Respectfully, plaintiff has been put in this position in this case time and time again to try and say what, like evidence, would have been available. If Reliance had gotten the file, then Reliance could know, do we really have all of the medical records, because that's something that they That's the question I'm asking you, because you're saying they should have requested it and it would have made a difference. And so I'm asking you, okay, what difference would it have made? Your Honor, it would have had an administrative law judge's determination. I believe there was about 200 medical records that were in there that they did not have, and that's part of the record somewhere, and I wish I could guide you there. That is to say the medical records in front of the Social Security Administration, to some degree, were different from the medical records available to the insurance company? Correct. And they would have been, for example, some sort of an independent examiner in the Social Security system, a medical examiner? Some of those, and then I think there were some additional medical records provided. She did have counsel in that matter. In that matter, meaning the Social Security matter? Correct, Your Honor. Yes, by the end of the claim, her conditions had gotten so severe that she was being recommended for a fusion. So when Reliance says, you know, this is just this malingerer who went out because she fell and she was going to have a baby, no, from 2008 to 2012 until 2013, her conditions on MRI findings were objectively getting worse. It's not the story that they want to see, but that's what was happening, and that's what the administrative law judge found. And to have a surgeon say that she should be having surgery, that's a fairly significant finding. Under the terms of the policy, what's the relevant date for determining disability? Is it ongoing? That is to say if she's found to be permanently disabled today but she wasn't a year ago, does she get long-term benefits? So I'm intrigued to ask this question when you're saying she's getting worse. So I'm trying to figure out at what point do we determine disability for purposes of the policy? You would need to determine disability as of the date that she became eligible and was receiving disability benefits. So you'd have to go back to those medical records. Would it be the date where she claimed that she was unable to perform the duties of any employment, not just her prior employment, because that's the date that would determine whether or not she was eligible for long-term disability benefits under the policy? Correct, Your Honor. What date was that? That date was 2009. It was around July 2009. I want to make sure I understand the significance of that answer. This is not a loaded question. This is just a question question. If she gets worse after that date, is that relevant? I think that it's relevant as to Reliance's questioning of her credibility. But is it relevant in terms of how disabled she is? Let's assume that we can establish without controversy. She was disabled X in 2009. She's disabled X plus Y in 2011. Does she get to count the Y now that we're past that date? That's my question. Yes. Yes, Your Honor, she does because she's dealing with degenerative conditions that only get worse. So you're telling me then that if she gets worse, even past 2009, but she was not permanently disabled at the time of 2009, you can still count that? Is that the answer you're giving me? Is the question clear? Yes. Yes. With a caveat that those worsening findings would substantiate the subjective complaints that she had been reporting to provide the basis for receiving disability benefits back then. Okay. I want to make sure I understood your answer. You're saying the getting worse later is only evident to your support for how bad she was in 2009? Or does the fact that she's much worse now, is that the disability that we're looking at? Your Honor. Do you understand my question? No, because I don't think you could break it out that way. I think you have to look at the totality of the medical conditions. Well, let me ask the question as simply as I know how to do it. At what point does she have to be permanently disabled in order to get long-term disability benefits under the policy? As of mid-2009, she needed to be disabled from any occupation. Right. And she needed to remain disabled. Right. And let's assume, and I'm not asking you to concede, let's assume that in 2009 she's not permanently disabled, but in 2015 she is permanently disabled. Does she recover under the policy? Yes, Your Honor, she can. Even though she was not permanently disabled in 2009? Yes, because... That's a pretty good policy, because sooner or later I'm going to get permanently disabled, you know, 20 years after 2009. I mean, I'm not, the answer you're giving me doesn't make any intuitive sense, but persuade me that that's the right answer. Well, let's say for hypothetical purposes that she was not disabled as of 2009. Okay? We would need to go look at the medical evidence as it existed at that time. Right. And we would need to look at Reliance's review at that time. Right. Reliance found her to have less than sedentary capabilities, and they approved the claim. Ms. Talbot will be significantly prejudiced now in 2019 if we have to go back and try and parse out at what point she may or may have not... But that's an evidentiary question. I'm asking you to put aside the evidentiary question and just assume she's not permanently disabled in 2009. She is permanently disabled in 2015. Can she recover? Don't you have to look at, like, when the policy was in effect, when she was covered by the policy? Yes. No, no. I mean, if she got disabled today, she's not covered by that policy. Correct. Right. So the fact that she's getting worse after the termination date of the policy has evidentiary consequence, but the fact that she's worse doesn't mean that she gets to look at her permanent state now and use that retroactively from the date of the policy. Yes, Your Honor. I agree. Okay. There we are. Okay. So I'm sorry. It took me so long to get there. No. And if I could make one point on that, and actually my time is up. There's... All right. One quick point, because you're very much over, and we have a long day today. There's no objective medical findings requirement in the policy, so they'd have to find her not credible. Thank you for your time. Okay. Okay. Talbot v. Reliance is submitted. I'm fine. Whatever works best for you. I think we're going to have to take that, because this is going wrong. It's your call. I'm fine either way. Okay. We'll take Talbot v. Reliance is submitted. We'll take a policy v. Saul.
judges: Wardlaw, W. Fletcher, Linn